Daniel, J.
The question presented in this case is, whether the act of the General Assembly, passed the 31st March 1848, entitled “an act concerning the jurisdiction of the General Court, and diminishing the number of the Judges thereof,” in so far as it undertakes to constitute the Special Court of Appeals therein mentioned, was, or was not, passed in pursuance of the amended constitution of Virginia. The duty of en *575 quiring into, and deciding upon the legal validity of an act of the Legislature, has always been regarded by this Court, and justly, as one of the most delicate it can be called upon to discharge. The delicacy of the task is, with me, much enhanced, by the consideration, that the question to be decided does, (in the light in which it has presented itself to my mind,) necessarily involve an examination not only of the extent of the judicial powers of this Court, but also of the nature and duration of its existence under the constitution, and the character of tenure by which its members hold their offices. Under a deep sense of the caution with which the subject, under such circumstances, ought to be approached, I have, in its investigation, earnestly endeavoured to discard from my mind every influence calculated to mislead the judgment, and have been watchful to suffer no impression to mature into a conviction until its correctness had been first subjected to the test of a calm and impartial enquiry. After giving to the learned and able arguments that have been made on each side, as far as I could, their just weight, and consulting such other sources as I supposed calculated to throw light upon the subject. I have been constrained by my convictions, to dissent from the opinion that will be delivered by the majority of the Court. I think that the cause assigned by the Judge of the Circuit Court, for refusing to enter upon his records, and execute the decree of the Special Court of Appeals, viz : “ That the said decree was pronounced by a Court having no lawful authority or jurisdiction,” is a true and sufficient cause.
In distributing the judicial power among the different portions of the judicial department, it was, I think, the design of the framers of the constitution to vest the supreme appellate power in one Court' — a Court permanent as the constitution itself. I am further of opinion that, notwithstanding the power given to the Legislature to regulate the jurisdiction of all the Courts, and *576 of the Judges thereof, there are certain judicial duties which must, under any regulation of jurisdiction under the constitution, belong to the Supreme Court of Appeajg an(j {0 tjU(jges thereof; that these judicial duties cannot be discharged by any but Judges regularly elected and commissioned as Judges of the Supreme Court of Appeals — Judges, whose independence is provided for, not only in the clauses which require that they shall receive fixed and adequate salaries, which shall not be diminished during their continuance in office, and that they shall hold their offices during good behaviour, (which apply equally to the Judges of the Superior Courts,) but whose entire freedom from all influence on the part of the legislative department, finds a further guaranty in the permanency of the Court to which they belong.
The judicial duties, and the only judicial duties that are, by the act constituting the Special Court of Appeals, assigned to that tribunal, are identical with those which are discharged by this Court, and which belong appropriately to a Supreme Court of Appeals; and no function or duty, which can characterize a Court, as a Supreme Court of Appeals, is withheld. The Judges, who are directed to hold the Court, have not been elected or commissioned as Judges of a Supreme Court of Appeals. They may be deprived of their offices and pay as members of the “ Special Court,” by an act abolishing the Court, passed by a bare majority of the Legislature ; and by an act abolishing the Superior Courts to which they have been respectively commissioned, passed by two thirds of the members of each house of the General Assembly, they might be deprived of their offices as Judges altogether. If these views of our constitution, and the law in question, be correct, the unconstitutionality of the latter would seem to follow as a necessary consequence. I shall endeavour to shew that they are.
*577 In the first section of the fifth article of the amended constitution, it is provided, that “ the judicial power shall be vested in a Supreme Court of Appeals, and in such Superior Courts as the Legislature may, from time to time, ordain and establish, and the Judges thereof; in the County Courts, and in justices of the peace.” Language more appropriate to convey the idea that there shall be but one such Court as that first mentioned, could not be used. The attribute of singleness, as an essential and characteristic quality of a Supreme Court, necessarily presents itself to the mind, in the plain and obvious definition of the terms employed.
The idea of a plurality of such Courts is equally inadmissible in view of that which must always be one of the grand objects sought to be attained in the establishment of a Supreme Court of Appeals, to wit, consistency and uniformity of decision.
The attainment of this object might be reasonably anticipated from the establishment of one such Court, whilst diversity of judgment and contrariety of decision must ever be the natural offspring, the inevitable result of the co-existence of two or more.
The conclusion being reached, that there can under the constitution be but one such Court, there arise therefrom strong considerations in favour of the construction that attributes to it an existence co-extensive in duration with that of the constitution itself. And looking to the ends of such an institution, it is difficult to conceive how one convinced of its utility, and of the necessity for its present existence, and about to provide in an organic law for its creation, could well anticipate the arrival of a time or state of things when such necessity would cease to exist. The arguments which might be successfully urged against the propriety of providing constitutional restraints upon the power of the Legislature to abolish Courts whose number public convenience might require at one time to be increased, and at another *578 to be diminished, might be justly regarded as of little weight when brought to bear against the propriety of providing for the permanent existence of a tribunal which could never be multiplied, and the necessity for whose continued existence would, in all human probability, never cease.
Accordingly, recurring again to the language employed by the framers of the amended constitution in creating this Court, we shall find that they have used terms, whose plain sense imports its unceasing existence, and which, when used on like occasions and for like purposes, has received a long and well known construction negatory of a right on the part of the Legislature to abolish it. “ The judicial power shall be vested in a Supreme Court of Appeals,” “ in the County Courts,” “in such Superior Courts as the Legislature may from time to time ordain and establish.”
What language more expressive of a design to invest this Court with a permanent and unceasing existence, could have been employed ? Can the period ever arrive, as long as the government lasts, when a legislative enactment, declaring that there shall not be a Supreme Court of Appeals, for a space of time however short, would not be in plain and direct conflict with the constitutional mandate that a portion of the judicial power shall be vested in that Court? But, as I have just above observed, the terms employed have received a construction which was well known to the members of the convention. The first section of the third article of the constitution of the United States is in the following words: “ The judicial power of the United States shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish,” &c. &c.
In. 1801, an act of Congress was passed, entitled “an act to provide for the more convenient organization of the Courts of the United States,” by which a conside *579 rabie addition was made to the number of inferior Courts and Judges. The Judges were appointed, and entered upon the performance of their duties. At an early day in the following session, a resolution was offered in the Senate for the repeal of the law. After along and able debate, in which most of the members, many of them eminent jurists, participated, the resolution was carried, and a law passed abolishing the Courts. The repeal of the law was resisted mainly on constitutional grounds.
It will be found, on a reference to the report of the debates, (see Debates on Judiciary, Senate U. S. 1802,) that it was conceded as well by those who advocated the repeal, as by those who opposed it, that Congress had no power to abolish the Supreme Court. The effort on the part of the latter was to shew that the inferior Courts were equally beyond the reach of Congress; whilst those in favour of the repeal, argued that there was a marked difference between the language used in reference to the Supreme Court, and that providing for the establishment of the inferior Courts, from which it was plain that the framers of the constitution regarded the former as established by the constitution, whilst the latter were placed wholly within the control of the Legislature. Brief extracts from one of the speeches delivered on each side, will shew the views of the respective contending parties in reference to this point of the debate.
Mr. Tracy — <[ Can you repeal a law establishing an inferior Court under the constitution? Will it be said, that although you cannot remove the Judge from office, yet you can remove his office from him ?” — “ That we can, with propriety, modify our judiciary system, so that we always leave the Judges independent, is a correct and reasonable position; but if we can, by repealing a law, remove them, they are in the worst state of dependence.” — “ No person will say that the Judges of the Supreme Court can be removed, unless by impeachment *580 and conviction of misbehaviour. But the Judges of the inferior Courts, as soon as ordained and established, are placed upon precisely the same grounds of independence -with the Judges of the Supreme Court. Congress may take their own time to ordain and establish : but the in-1 stant that is done, all the rights of independence attach to them.” Page 69-70 Debates.
Mr. Mason of Virginia — “ When I view the provisions of the constitution on this subject, I observe a clear distinction between the Supreme Court and other Courts.” — “ With regard to the institution of the Supreme Court, the words are imperative, while with inferior tribunals they are discretionary. The first shall, the last may be established.” — “ When the constitution, using this language, says a Supreme Court shall be established, are ioe not justified in considering it as of constitutional creation; and on the other hand, from the language applied to inferior Courts, are we not equally justified in considering their establishment as dependent upon the Legislature, who may from time to time ordain them as the public good requires.”
The provisions of our constitution, in relation to the establishment of Courts, and the distribution of judicial power among them, bear a still stronger resemblance to those of the constitution of the State of Kentucky, relating to the same subject: “The judicial power of this Commonwealth, both as to matters of law and equity, shall be vested in one Supreme Court, which shall be styled the Court of Appeals, and in such inferior Courts as the General Assembly may from time to time erect and establish.” Art. 4, sec. 1, Kentucky Const. “ The Court of Appeals, except in cases otherwise directed by this constitution, shall have appellate jurisdiction only, which shall be co-extensive with the State, under such restrictions and regulations, not repugnant to this constitution, as may from time to time be prescribed by law.” Art. 4, sec. 2. “ There shall *581 be established in each county now, or which may hereafter be erected within this Commonwealth, a County Court.” Art. 4, sec. 5.
The great indebtedness of the citizens of Kentucky to the northern merchants, had, prior to the year 1824, , . led to the passage of a series of enactments composing what was termed the relief system, and designed to alleviate the distresses of the debtor class of the community, by postponing the collection of debts.
The question as to the validity of these laws being brought, by appeals, before the Supreme Court of Kentucky, that Court decided them to be unconstitutional and void — in conflict with the clause in the federal constitution prohibiting the passage of laws impairing the obligation of contracts.
This decision excited much popular discontent, and in the year last mentioned, the opposition to it, increased and strengthened by other causes of dissatisfaction with the Court that made it, led to the passage of an act abolishing the then existing Supreme Court, and establishing a new Court of Appeals in its stead. Four Judges were elected and commissioned to discharge the duties of the new Court, and their officers proceeded to take possession of the records. The Judges of the old Court still, however, continued their sessions. An angry struggle between the two Courts, each claiming the sole and exclusive right to decide upon appeals, as a Court of the last resort, was the result. This controversy between the old and new Court parties was conducted with the most bitter feelings for some two or three years; and after bringing the State to the very verge of civil war, was at last terminated by the passage of a law repealing the act establishing the new Court.
In the case of Hildreth’s heirs v. M’Intire’s devisee, 1 J. J. Marshall’s R. 206, the subject for the decision of the Supreme Court was the constitutionality of the law creating the new Court. The new Court had dismissed *582 an appeal which had been taken to the Court of Appeals, because the record had not been filed with its clerk. A certificate of the dismission having been certjge(j tQ t{je circuit Court from whose judgment the appeal had been taken, the last mentioned Court received and entered it, and issued execution to carry into effect the original decree. An appeal from the last mentioned proceedings of the Circuit Court necessarily brought up for decision the validity of orders and decrees made by the new Court. The Supreme Court unanimously decided that the new Court never had a legal and constitutional existence, and that the Circuit Court erred in respecting and obeying its mandate. The grounds of the decision are set forth in the opinion of one of the Judges, in which all the others concurred.
The following extracts will sufficiently exhibit the grounds of the opinion: '•'•There cannot be more than one Court of Appeals in Kentucky as long as the constitution shall exist.” — “ The gentlemen who directed the appeal in this case to be dismissed, and the one who certified the order, did not hold office in the Court of Appeals. The Legislature had attempted to abolish the Court of Appeals, ordained and established by the constitution, and create in its stead a new Court. This attempt was ineffectual for want of legislative power. The offices attempted to be created never had a constitutional existence; and those who claimed to hold them, had no rightful or legal power. They were not appointed to the Court of Appeals fixed by the constitution.” — “ The Court of Appeals had not been and could not be abolished. Its Judges had not been removed from office, and were acting and ready to continue acting as Judges. The act of the Legislature did not intend to superadd four Judges to the number already in office in the Court of Appeals. It cannot receive, and never has received such a construction. The gentlemen who acted as Judges of the legislative tribunal did *583 not claim to be, and certainly were not, associates of the Judges of the Constitutional Court. They were not their successors.” — i! Their acts cannot be enforced by law. The Circuit Court proceeded on the assumption that either this new tribunal was the Court of Appeals, or that it was such a defacto Court as could exercise judicial functions ad interim. In this the Court erred. Therefore the judgment is reversed.”
The terms used in our constitution, in providing for the establishment of the Courts, being thus shewn to have been previously well defined by popular, legislative and judicial construction, there would, in the absence of any light furnished by a history of the proceedings of the convention, guiding to a different conclusion, arise a fair inference that the framers of the constitution, in using the terms, intended also to adopt, with them, the construction. If then, we shall find, on looking into the Debates of the Convention, that these terms were frequently the subjects of remark by members of that body, and that the propriety of using them was often discussed; that the construction theretofore given to them was adverted to, and the propriety of using the language in question maintained by some of the most distinguished statesmen of the body, on the very ground that its meaning was authoritatively fixed and ascertained, are we not justified, (even though it shall also appear that the propriety of the construction, and the authority of the precedents establishing it, was questioned by some,) are we not well justified, in concluding that a majority of the convention, in employing the terms, designed to connect and adopt with them, the construction theretofore thus claimed for and given to them?
The views of the committee on the judiciary, in relation to the subject committed to their charge, as first reported to the convention, were embodied in a series of resolutions, the first of which was in the following words:
*584 “ 1st. Resolved, That the judicial power shall be vested in a Court of Appeals, in such inferior Courts as the Legislature may from time to time ordain and estaban(j jn tfje County Courts, The jurisdiction of th0156 tribunals shall be regulated by law. The Judges of the Court of Appeals, and of the inferior Courts, shall hold their offices during good behaviour, or until removed in the manner prescribed in the constitution ; and shall, at the same time, hold no other office, appointment, or public trust; and the acceptance thereof, by either of them, shall vacate his judicial office. No- modification or abolition of any Court shall be construed to deprive any Judge thereof of his office; but such Judge shall perform any judicial duties which the Legislature shall assign him.”
The question in committee of the whole, being on this resolution, a motion was made by Mr. Bayly to strike out the words “ and in the County Courts.” After stating that his object was not to destroy the County Courts, but to place them with the inferior Courts, under the control of the General Assembly, he proceeded to say: “If my proposition shall prevail, it will make the Court of Appeals the only supreme and constitutional Court, and have all other Courts subject to legislation, as circumstances and the good of the Commonwealth may require,” &c. Debates Virginia Convention, page 502. Mr. Henderson, who sustained the motion, stated, that in supporting the motion, “it was his wish to vest the judicial power of the Commonwealth in the Court of Appeals, the Superior Courts, meaning the General Court, the Circuit and Chancery Courts, or such substitutes for them as legislative wisdom might devise, and in the justices. Thus the County Courts would, like the Chancery and Circuit Courts, be alterable as the interests of the State required. Gentlemen have asked, if it is the policy of the friends of the motion to distinguish the Court of Appeals, and *585 place it above the control of the Legislature. Surely, no lawyer of experience will require argument to prove that the supreme appellate tribunal of the State should have its foundation firmly laid in the organic law. It is clear that such is the result of any written constitution. If the Legislature oversteps the limits of the constitution, there must be a tribunal to declare its acts invalid ; it would be a mockery to place this tribunal at the mercy of the Legislature ; a solecism in politics. Prom this reasoning, the supremacy of the Court of Appeals arises,- and the gentleman from Chesterfield, (Mr. Leigh,) will be the last man to controvert the reasoning, or deny its consequence. Here we all agree .- farther, in giving constitutional consecration to the Courts, it appears to me, we are forbidden by wisdom and discretion to go. The great principle of policy, which founds and shields the Court of Appeals, has no sort of application to the other Courts; and least of all, to the County Courts. The General Court, which decides ultimately on the life of a citizen, and the Superior Courts of Chancery, as well as Law, are, to use the language of gentlemen, to be subjected to ‘the whim of the Legislature,’ while the County Courts are to be placed beyond its reach. Is this wise ? Is it consistent ? Is it not slighting the superior and nursing the inferior ?” Page 520.
At a subsequent stage of the proceedings, the report of the committee on the judiciary being still under consideration, a motion was made to strike from the first resolution the last clause: “ No modification or abolition of any Court shall be construed to deprive any Judge thereof of his office,” &c. Great inconvenience, it was argued, might result from retaining the clause, as it would prevent the Legislature from ridding the State of Courts and Judges, which experience might shew were not necessary to the dispatch of the judicial business. Page 608. Mr. Tazewell moved to amend the amend *586 ment by striking out the words, “ a Court of Appeals,” in the first part of the resolution, and inserting in lieu thereof, the words “ one Supreme Court.” — “ In advocating the amendment, Mr. Tazewell observed, that this at first view might appear a mere verbal criticism. He should not stop to enquire whether it were so or not, but would go on to observe, that by so altering the phraseology, it would be made to conform in terms to that used in the constitution of the United States, and then they would have the settled interpretation put upon that phrase, which would answer the argument of the gentleman from Augusta, (Mr. Johnson.) Then they would have the Supreme Court of the State a constitutional Court, and the inferior Courts legislative ones; and as, according to the settled construction of the constitution of the United States, Congress had power to remodel or abolish the inferior Courts of the Union, so the Legislature of Virginia would have power over the inferior Courts of Virginia. Then the question as to the operation of the clause proposed to be stricken out, would be confined exclusively to Courts of the latter description.” — “It is true, there must be an independent department, but there is no need of but one such department. The inferior Courts must be subjected to the Legislature. Preserve your Supreme Court independent, and you get all you need. If the amendment shall obtain, then the constitution of Virginia will read as the federal constitution does now: You will have one Supreme Court, with its Judges holding their offices during good behaviour, beyond the control of the Legislature, just as the Judges of the Supreme Court of the United States are beyond the reach of congressional power, while your inferior Courts, like those of the Union, will be subject to legislative control, and may be modified or abolished at will. This is not speculation: it accommodates the constitution of Virginia to the terms of the constitution of the Union, which has re *587 ceived a fixed interpretation, and concerning whose meaning doubt is removed by a long train of recorded decisions.” P.615. Mr. Campbell of Brooke, “ should vote for the amendment of the gentleman from Norfolk. He had always thought that there ought to be but one constitutional Court, and that it ought to have two kinds of jurisdiction, appellate and original. It was now called ‘ a Court of Appeals,’ and its jurisdiction of course was appellate only; but if it were denominated a Supreme Court it might be endowed with original jurisdiction also.” By other members who participated in the debate, it was made a ground of objection to Mr. Tazewell's amendment, that the change of phraseology proposed, would give to the Court of Appeals the capacity to receive original jurisdiction. This amendment being negatived by a large majority, Mr. ¡Stanard thereupon moved to amend by inserting the word “Supreme” before the words “ Court of Appeals,” so as make the title of the Court read as it now stands in the constitution, “A Supreme Court of Appeals.” This amendment was agreed to without a division. During the discussion, it was admitted by some of the members that the federal constitution had received the construction stated by Mr. Tazewell; but they argued that a different construction might be thereafter given, and that the clause “ no modification,” &c. proposed to be stricken out by Judge Barbour, might be found necessary as a protection, not only to the Judges of the Superior Courts, but also to those of the Supreme Court. To which Mr. Tazewell answered, that he cared not how many different constructions might be put on the federal constitution thereafter. “If the convention (he said) adopt its language now, it adopts it as now construed. I am for adopting the words as they are now understood — I would take the words ‘a Supreme Court’ under the construction held by every department of the federal government, that the Supreme Court is a consti *588 tutional Court. If we adopt the terms under this coustruction, we adopt the construction itself.”
The motion of Judge Barbour was also lost; but the ciauge jn question was subsequently much discussed, anq aftev various amendments, finally assumed the shape in which it now stands in the second section of the fifth article of the amended constitution, to wit: “ No law abolishing any Court shall be construed to deprive a Judge thereof of his office, unless two thirds of the members of each house present concur in the passing thereof; but the Legislature may assign other judicial duties to the Judges of Courts abolished by any law enacted by less than two thirds of the members of each house present.” It will be perceived that this section does not, in express terms, either enlarge or restrict the power of the Legislature to modify or abolish the Courts; but merely declares that a Judge shall not be deprived of his office by an act abolishing his Court, unless it is passed by two thirds of the members of each house. It is true, however, that the provisions of this section would be idle; they would have no office to perform, if there were no Courts, which it was in the power of the Legislature to abolish. And if in providing for the establishment of the Courts, the framers of the constitution had used like terms with regard to all, both the Supreme and the Superior Courts, there would arise from the adoption of the second section, the inference of a design to leave all alike within the power of the Legislature. As however there is a marked difference between the terms employed in reference to the Supreme Court, and those used in reference to the Superior Courts, and as full meaning may be given to all the words of the second section, and a proper function assigned to its several members, by treating it as designed to apply to the Superior Courts alone, no argument can be drawn from that section, adverse to the construction that attributes to the Supreme Court an existence beyond the reach of the Legislature.
*589 The fourth section provides, that the Judges of the Supreme Court of Appeals and of the Superior Courts shall be elected by the joint vote of both houses of the General Assembly. The obvious meaning of this requirement is, that the Judges of the Superior Courts shall be elected as Judges of the Superior Courts, and those of the Supreme Court as Judges of that Court— otherwise it would have been unnecessary to have said more than that “ the Judges shall be elected,” &c. The spheres in which the Judges are severally to act, the rank and station which each is to occupy in the judicial system, are indicated in their elections and marked out in their commissions. Those who are elected as Judges of the Superior Courts may be required to officiate in any of the Superior Courts — in any Courts which are intermediate between the Supreme and the County Courts; whilst those who are elected as Judges of the Supreme Court cannot be required to discharge the duties of any other than the Supreme Court. The maintenance of the proposition that the Supreme Court may be composed of Judges elected to the Superior Courts; or in other words, that the Supreme Court may be established by a legislative mandate to a number of the Judges of the Superior Courts to hold it, must result in one of three conclusions; either that the Supreme Court might be abolished by an act of the Legislature, passed by two thirds of the members of each house, abolishing the Supreme Court to which the Judges directed to hold it, had been elected and commissioned, which would be directly at war with the proposition already established, that the Supreme Court cannot be abolished by any act of legislation ; or that the Supreme Court might be held by persons no longer holding judicial offices — an absurdity which no one would uphold ; or that the Judges of the Superior Courts, by mere force of an act directing them to hold the Supreme Court, might become Judges of a Court which cannot be *590 abolished; and thus be placed beyond the reach of the Legislature, which would be in plain contravention of the provisions of the second section, which were desjgne(j t0 apply^ as we have shewn, to the Judges of the Superior Courts, and which in effect declare, that they may be deprived of office by an act passed by the constitutional majority, abolishing the Superior Courts to which they have been elected.
The fourteenth section of the old constitution of Virginia provided that the two houses of assembly should, “by joint ballot, appoint Judges of the Supreme Court of Appeals and General Court, Judges in Chancery, Judges of Admiralty,” &c.
In the case of Kamper v. Hawkins, 1 Va. Cas. 20, the question to be decided was, whether a Judge of the General Court could constitutionally exercise the functions of a Judge in Chancery. In 1792, the Legislature having passed an act giving to the District Courts the same power of granting injunctions to stay proceedings on any judgment obtained in any of said Courts, as was then had and exercised by the Judge of the High Court of Chancery in similar cases, an application was made at the May term 1793, of the District Court held at Dumfries, for an injunction to stay the proceedings on a judgment obtained at a previous term of that Court. The Judge adjourned the question, for novelty and difficulty as to the constitutionality of the law, to the General Court, which, consisting of Judges St. George Tucker, Tyler, Henry, Roane and Nelson, came to the unanimous conclusion, after a most elaborate examination of the question, that the law was unconstitutional; that the duties required to be performed by the act could only be executed by persons constituted Judges in Chancery, in the manner prescribed by the constitution. They held that the specification in the constitution of Judges of several tribunals, led to the conclusion that the tribunals themselves were meant to be separate and *591 distinct tribunals — that “Judges in Chancery” could not, by a legislative enactment, be required or empowered to sit in the General Court, nor the Judges of the latter to sit in chancery, or to perform the functions of Chancellors — but that each class of Judges was designed to be restricted, in the performance of duty, to the Courts to which they were severally elected and commissioned. The reasoning by which the propriety of the decision in Kamper v. Hawkins is vindicated, applies, it seems to me, with greater force to the case before us, than it did to that out of which it was elicited: for, under the old constitution, all the Courts therein mentioned stood upon the same footing. All of them were constitutional Courts, and none of them could be abolished by the Legislature. Whilst in the amended constitution, the intention to treat the Superior and Supreme Courts as distinct tribunals, is not only as plainly manifested in the section providing for the election of the Judges, as was the like intention respecting the General and Chancery Courts, in the corresponding provisions of the old constitution, but is also still more strongly indicated, as we have shewn, in the section providing for the establishment of the Courts.
It being seen that the constitution designs the establishment of one Supreme Court of Appeals, that it withholds from the Legislature power to abolish it, that it requires a separate election of the Judges who are to compose it, there would seem to be a strange want of consistency in the system contemplated, if it should be found that the duties to be assigned to the Court, were left wholly within the legislative control. Why should the framers of the constitution declare, in effect, that there shall be but one Supreme Court, if they did not design its duties to be exclusive ? Why say that the Court shall not be abolished, if they did not intend those duties to be permanent and unceasing ? Why provide for the separate election of the Judges? Why *592 throw around the Court peculiar safeguards, if it was not designed for the performance of appropriate and peculiar functions?
The designation in the constitution, of the tribunals in which the judicial power of the State is to be vested, would seem to be without any wise aim or purpose, if the Legislature may, in its discretion, assign to each the same or like judicial duties. If the Judges of the Superior Courts may in virtue of their office be required to discharge the duties of Judges of the Supreme Court, the provisions for the separate establishment of the Courts, and the separate election of the Judges, are but useless and idle restraints on the power of the Legislature. It being settled that the existence of the County Courts as they were, should be recognized., and a portion of the judicial power assigned to them in the constitution, there would have been, in the absence of any design to make an appropriate distribution of judicial duty among other tribunals, no necessity for their designation. In such a scheme, the design of the framers of the constitution would have been plainly indicated by declaring that the judicial power should be vested in the County Courts, and in such other Courts as the Legislature might from time to time ordain and establish.
The general terms in which power is conferred upon the Legislature to regulate the jurisdiction of the Courts, must find a limitation to their meaning, in the provisions for the establishment of the Courts and the election of the Judges, or the argument that attributes any value to the scheme of a judicial system in the constitution, must be abandoned. We cannot impute to the framers of the constitution the folly of erecting a tribunal, and throwing around it the shield of inviolability, and yet leaving all the purposes to be accomplished by it, the character of its duties and functions, within the direction and control of the body against whose power they have manifested the most anxious care, the most *593 deliberate intention to protect it. In any regulation of jurisdiction, reference must be had to the character of the respective Courts, the nature and quality of their functions and duties. There is no clause in the constitution, declaring in so many words, the specific judicial duties to be assigned to each Court or class of Courts; but the intention to rank and classify them is manifest, and the nature of the judicial power to be vested in each, is plainly indicated by the terms calling for their establishment. To the Supreme Court of Appeals there must be assigned, under any constitutional regulation of jurisdiction, the duties which its style and title import and call for — supreme appellate power; and appellate power only is its characteristic attribute.
We have seen, that in the convention objection was made to the motion to give to it the title “ one Supreme Court,” simply on the ground that such a designation would indue it with the capacity of receiving original jurisdiction ; that this objection prevailed, and led to the adoption of the style it now bears in the constitution, “a Supreme Court of Appeals.” The shield of that construction which denies power to abolish it, was thus thrown around the Court, and the nature of its judicial power ascertained in the terms of its creation and discriminative appellation. Under the power to regulate the jurisdiction, the Legislature may declare what shall be the character of the judgments or decrees from which appeals to the Supreme Court are to be allowed, whether final or interlocutory; may prescribe the terms on which they may be granted, the time in which they may be taken; and may restrict the jurisdiction of the Court to such sum of money, or value of subject matter of controversy, as in its discretion it may think right; but no matter what may be the value or nature of the controversy on which the Court is called to decide, or the terms, time, or manner of its taking jurisdiction, the duty which the Court discharges must always involve *594 the exercise of supreme judicial power. The quantum °f business, the amount of judicial duty to be performed by the Court, may be made to vary from time to time, tjje regHiati0ns and restrictions which the Legislature adopts, with respect to the right of appeal; but the nature of the duty, the quality and character of the power to be performed and exercised, is fixed and ascertained in the constitution, and must ever remain the same.
The right of appeal is the great test of the superiority and inferiority of the different Courts. The sense in which the terms supreme and superior are used in the constitution, is to be ascertained by referring to this standard, and not to the value, number or character of controversies over which the Courts may be called to exercise their jurisdiction. In Kempe's lessee v. Kennedy, 2 Cond. Rep. 223, Chief Justice Marshall, in defining the term “ inferior,” as used in the federal constitution, in connexion with the Court, says: “All Courts from which an appeal lies, are inferior Courts in relation to the Appellate Courts, before which their judgment may be carried.”
As there is no clause in the constitution, nothing in the term itself, to prohibit it, to the Superior Courts may be given original as well as appellate jurisdiction. So far as they exercise appellate jurisdiction over the decrees, judgments and orders of the County Courts, and so far only, they are superior to the latter in the sense contemplated in the constitution. To the Supreme Court of Appeals, supreme appellate power, and appellate power only, can be given ; and thus it is supreme over all the Courts, the highest in judicial power. To ascertain the value of the controversies on which the Courts are severally to act, and prescribe the terms, time and manner of their taking jurisdiction, in other words to regulate the jurisdiction of these several tribunals, is one thing, and is given to the Legislature; to prescribe *595 the nature of the functions to be performed with regard to these controversies, the degrees of “judicial power” to be vested in the respective Courts, is another thing,- and is, as we have before remarked, fixed in the constitution.
The fact that the efficiency of the judicial system must, to some extent, depend on the manner in which the Legislature exercises its right to regulate the jurisdiction of the Courts composing it, furnishes no support to the argument that would subject the existence of the system itself to the legislative will. The limits within which the judicial control of the Supreme Court over the decisions of the other Courts is to operate, may be contracted or enlarged, as the Legislature, in its wisdom, may diminish or increase the sum necessary to give jurisdiction to the Court; but it by no means follows therefrom, that this control may be given, either in whole or in part, to another Court.
It remains to enquire whether the duties assigned to the “ Special Court of Appeals,” by the act constituting it, are not identical, in character, with .those which we have endeavoured to shew appertain to the Supreme Court of Appeals; whether they do not involve the exercise of the same degree of judicial power, and a like control over the decisions of the other Courts. The act requires the five Judges of the Circuit Courts, who stand first in commission, to convene regularly every year in December, on the day after the adjournment of the General Court, and to hold a Special Court of Appeals. They may adjourn from time to time, and may sit as often and as long as the Judges thereof may consider they can properly sit, without interfering with their duties as Judges of the General Court and of the Circuit Superior Courts. The clerk of the Supreme Court of Appeals at Richmond is required annually, in December, before such Special Court commences its session, to make out a docket of all causes, which, on *596 the day for such commencement, shall have been depending in the Supreme Court more than two years, without being heard, unless the number of such causes, rea(jy por bearing, exceed seventy, in which case the c]erjj; shan make ollt a docket of the seventy causes ready for hearing, which shall have been longest pending in said Court; and such Special Court is to proceed to hear and determine all causes on the docket so made out. It is provided, however, that no case shall be placed upon said docket, when any party by himself or his counsel, shall object thereto. After the Special Court commences its session in December, the Court of Appeals at Richmond is to proceed during the winter and spring, to hear and determine such of the causes depending therein, as may not be on the docket of the Special Court. In the interval between the time at which the Court of Appeals at Richmond may commence its session in the fall, and the time at which such Special Court may commence its session in December, the Court of Appeals at Richmond may hear and determine any cause which may remain depending therein, notwithstanding it may have been on the docket made out for the Special Court. If a majority of the Judges of the Special Court be interested in, or from sickness or other reason unable to hear and determine a case on its docket, the case is to be stricken therefrom, and thereáfter the Court of Appeals are to hear and determine it. The clerk of the Court of Appeals, in person or by deputy, is required to attend the sessions of the Special Court, and to enter their proceedings, which are to be signed by the presiding Judge. And the decisions of such Special Court are to be certified and carried into execution, as if made by the Supreme Court of Appeals.
Each of the five Judges of the Special Court is, in addition to his annual salary, to receive ten dollars per day, for each day’s attendance on the Court, and be *597 paid mileage for travel to and from the place of session, at the same rate as for other necessary travel. They may appoint their own crier and tipstaff, and allow them a reasonable compensation.
The reporter of the Supreme Court of Appeals is not required to report any causes decided by the Special Court, but said Court may allow any person approved by it to report its decisions, provided it be done free of expense to the State.
Such are the main provisions of the act constituting the Special Court of Appeals. In what respects do the duties required of the Special Court differ from those assigned to the Supreme Court? Is not the nature of the control exercised by each Court over the decisions of the other Courts of the State, the same ? Do not the same judicial results flow from the adjudications of the Supreme and the Special Courts? What right of the citizen can be determined by the former which ma3r not be as definitively settled by the latter? In fine, is there any characteristic of supreme judicial authority, which mere legislation can confer on any Court, and which, by the act constituting the Special Court, is withheld from it ?
The seventy causes which are annually to be transferred to the docket of the Special Court, are of the same character, whether we look to the amounts involved or the subject matters of controversy, with those retained to be determined by the Supreme Court. Certainly no difference in these respects is contemplated by the act. The Special Court is to hear and determine them as it would, but for the act, have been the duty of the Supreme Court to hear and determine them; and the decisions of the Special Court upon them are to be certified and carried into execution in the same manner as if they had been made by the Supreme Court. Irreversibility of judgment and indisputableness of control over the decisions and proceedings of the inferior tri *598 bunals, all the legal sanctions that can mark the mandates of a Court as emanations of supreme judicial power, are, by the act in question, attached to the judgments and decrees of the Special Court.
It is true that the power to grant appeals is not given to the Court or its Judges, but it is very obvious that the absence or presence of the power is no test of judicial rank. If the Legislature can constitutionally confer upon the Court the dignity of judicial power attached to the decisions of an ultimate tribunal, it is very clear that, under the right to regulate its jurisdiction, it may prescribe the manner in which the causes to be subjected to the exercise of the power may be brought before the Court. The Legislature may prescribe, as it has done, that the appeals from the decisions of the inferior tribunals, shall be allowed by the Supreme Court, or by any of the Judges thereof in vacation, or it may confer this right on the Special Court and its Judges; or it may pass a law, allowing them as a matter of course in all cases; or it may even make the act of granting them, the duty of the tribunals whose decisions may be sought to be reversed.
It is not the power of granting appeals, but that of deciding them as a Court in the last resort, and of causing the decisions to be respected and obeyed by all other Courts in the State, that denotes in a judicial tribunal the residence of supreme appellate power. Now the only end and purpose for which the Special Court is created, its sole business and occupation, are to determine appeals. Its decrees and judgments are in no respects subject to the revision of any superior, whilst they act as mandates to all inferior Courts, to be by them observed and executed.
It has been very strongly argued that the clause providing that no case shall be placed on the docket of the Special Court, where any party by himself or counsel shall object, removes all the constitutional difficulties in *599 the way of that Court’s proceeding to exercise the jurisdiction given to it by the act. Giving to this clause the construction that would make it of most avail in any argument maintaining the constitutionality of the act, to wit, that it amounts in effect to a requirement that the assent of the parties should precede any action of the Court, I should still regard the proviso as of no effect. I have endeavoured to shew that the Court itself has no foundation in the constitution, being created solely for the purpose of discharging certain judicial functions, which, in the plan of the judicial system, appertain exclusively to another tribunal.
The consent of parties, however formally made, cannot give to a tribunal so constituted the powers that belong to a Court, or clothe its orders with the'force of judicial mandates. The reasoning of the Circuit Judge on this head, in the opinion accompanying his return to the rule, is so forcible, and to my mind so convincing, that I deem it unnecessary to do but little more in reference to this branch of the enquiry than refer to it and to a decision of the Supreme Court of Kentucky, in the case of Stark’s adm’rs v. Thompson’s adm’rs, 3 J. J. Marshall’s R. 299, in which it will be seen that ail actual agreement of the parties to abide by the judgment, was held to be incompetent to give validity to the judgment of an unconstitutional Court. The case is stated in the opinion of the Court, which is brief, and is as follows: — “ The only question involved in this case is, whether it is the duty of the Circuit Court to regard and obey the maudate of the tribunal commonly denominated the ‘ New Court,’ when by parol the parties had agreed, that whatever opinion it should express should be obligatory on them ? This tribunal had no judicial power or authority. Consent could not give it jurisdiction or constitute it a Court. If parties litigant might submit their controversies to its incumbents as arbitrators, their award could only be enforced as any other ar *600 bitrament might be carried into effect. A submission, to them, was not made in this case, by the order of the Circuit Court, and consequently the Court had no right to make their decision its judgment. It had no right to take any notice of their mandate, unless a suit had been brought on the submission; and then, whether it should have been respected, would have depended on whether the submission had been made to them as appellate Judges, or as ordinary arbitrators. The Court, therefore, did not err in refusing the mandate.” The unconstitutionality of the “ Special Court,” being established, the case before us falls fully within the reason of the decision just cited.
Those who deny the constitutionality of the “ Special Court” are, however, met by precedents of Special Courts established, as well under the old as the new constitution, to decide cases in a peculiar situation on the docket of the Court of Appeals. Supposing these Special Courts to have been legally constituted, I entirely concur with the Circuit Judge in the opinion that they furnish no binding precedent for the establishment of the Special Court of Appeals, now under consideration. They were formed under circumstances and for purposes totally different from those which attend and are brought forth to sustain the “ Special Court.” I am strongly inclined, however, to doubt whether any of the Special Courts referred to were strictly constitutional, and to concur in the opinion on this head, given by Judge Henry, in the case of Kamper v. Hawkins, who regarded them as unconstitutional. He excused his having on one or two occasions sat as a member of such a Court, on the ground that they were temporary; that they rarely happened; that “ it was exceedingly disagreeable to be always faulting the Legislature ; and perhaps one particular mischief had better be submitted to than a public inconvenience.” 1 Va. Cas. 55. 1 think it probable that like reasons have operated on the minds of many other Judges.
*601 The cases in which these Courts have been called have been very rare ; and whilst the evils they were intended to remedy were most apparent and pressing, there was little or no danger that the decisions would in any respect interfere with the leading end of the Court of Appeals — uniformity of decision. Many of the Judges who have heretofore composed these Courts, influenced by these and like considerations, have probably thought it best to waive any enquiry as to the constitutional authority for the establishment of the Courts. Precedents drawn from instances of such Courts so established, I cannot regard as of sufficient force to forbid us to examine into the constitutionality of an act like that now under consideration, which transfers from the Supreme Court to another a large portion of the business of the former — a portion that will in all probability, judging from the past, constitute for the next ten years about one half of the cases tried : thus opening an ample field for that conflict of decision, and confusion in the ultimate exposition of the law, which it was thought would be avoided by the establishment of one Supreme Court. Having investigated the subject free from the influence of these supposed precedents, I have been unable to find any warrant in the constitution for the Special Court, and feel constrained to regard the existence of the two Courts, to wit, of that modified as it may be, if the act as it now stands is constitutional, and the Supreme Court, at the same time, as presenting a solecism in government no less strange than would be that of two independent Legislatures, each claiming to legislate for the same State, and over the same subject matters.
The denial of power to the Legislature to establish such a Court as the “ Special Court,” does not, as I conceive, involve any interference with their right to regulate the jurisdiction of the Courts. The ground of objection which I take to the act of March 31, 1848, is *602 not that, in the exercise of the right to regulate the ju- . T . .. i • n risdiction, the Legislature have imposed any unwise or improper limitation or restriction on the qualified right ^ ^ citizen to an appeal, but that the appeals, when ta^en> are by the act transferred to the decision of a tribunal not contemplated by the constitution.
I do not deem it necessary to make an enquiry as to the mode of compensation for the Judges adopted by the act, as it is claimed that they discharge their duties by virtue of their commissions as Circuit Judges. If they can act as Judges of a Supreme Court of Appeals, by virtue of their commissions as Circuit Judges, I do not perceive how the payment provided for the discharge of their duties in the former Court, can of itself affect the validity of their judgments. In fact, however, in the view I have taken of the subject, the tribunal would be void, even though the Judges had been regularly appointed and commissioned as Judges of the Court of Appeals, the Supreme Court being already organized and in existence.
With the fullest confidence in the purity of purpose which led to the passage of the act, it has been to me a source of unfeigned regret that I have been constrained by a sense of duty to express my dissent from the General Assembly as to the existence of their constitutional power to enact it.
Baldwin, J. The purpose of the act of the 31st of March 1848, Sess. Acts of 1847-8, p. 51, in constituting a Special Court of Appeals, was to remedy and prevent the recurrence of a great and growing evil. The business of the Supreme Court of Appeals had been accumulating for a number of years, until its docket at Richmond, became so unwieldy as to defy the mental, moral and physical powers of its Judges, who, as well as the public at large, had long surrendered all hope of their being able to reduce the enormous mass, or to arrest its continual growth. The mischief was felt *603 throughout the breadth of the land, in the despair and ruin of suitors and their families, in the disrepute drawn upon the administration of justice, and in the derogation from the fame of the Commonwealth herself. There was even danger of reproach to the legislative department of the government, for inactivity and supineness, under circumstances calling so loudly for redress.
The result has been the passage of the act in question, the policy of which is, by calling in the aid of Judges of the General Court, to occasion a dispatch of business, which, within a practicable time, will remove the existing incubus, and enable this Supreme Court to discharge beneficially the appropriate functions for which it was instituted.
This policy is indicated and subserved by the provisions of the statute, and no one supposes that these are not well adapted to the accomplishment of the end contemplated. But objections of the most serious import have been urged against the authority of the Legislature to make such enactments, which are assailed as invading the constitutional supremacy of this Court, as impairing the constitutional tenure of the judicial office, and as violating the constitutional provision for judicial compensation. These grave imputations require a calm and careful consideration.
Our amended constitution provides that “ the judicial power shall be vested in a Supreme Court of Appeals, in such Superior Courts as the Legislature may from time to time ordain and establish, and the Judges thereof, in the County Courts, and in justices of the peace”— that “ the jurisdiction of these tribunals, and of the Judges thereof, shall be regulated by law” — and that “the Judges of the Supreme Court of Appeals, and of the Superior Courts, shall be elected by the joint vote of both houses of the General Assembly.”
It was thus made the duty of the Legislature to create a Supreme Court of Appeals, by its constitutional ap *604 pellation, and to appoint the Judges thereof. This duty being performed, the tribunal so constituted stood in the judicial system as the Supreme Court of Appeals, contemplated by the constitution, with the capacity to receive such appropriate jurisdiction as the Legislature thought proper, from time to time, to confer upon it.
The regulation by law of the jurisdiction of the several Courts of the Commonwealth, embraces the distribution of the judicial power amongst them; in regard to which, there is no limitation, except such as arises out of the distinctive character of the tribunals, so far as designated by the constitution. The jurisdiction of the Supreme Court is to be appellate, or of that nature in a liberal sense ; that of the other Courts may be either original or appellate — the jurisdiction of all may be either civil or criminal. There can be no appeal from the Supreme Court to the Superior Courts, nor from the latter to the County Courts; but, on the other hand, there is no constitutional right of appeal from the County to the Superior Courts, nor from the latter to the Supreme Court. The legislative department has authority to terminate litigation where it pleases, but cannot protract it beyond the Supreme Court of Appeals.
The jurisdiction of this Court is constitutionally supreme, not because it is final, but because it cannot be otherwise. The jurisdiction of other Courts may be rendered final by legislative permission, during which they have a kind of supremacy, but not in a constitutional sense. Thus the right of appeal from the County Courts, or the Superior Courts, may be withheld or restrained, at the discretion of the Legislature. But in the nature of things, no appeal can be allowed from the Supreme Court of Appeals to any other tribunal.
The jurisdiction of the Supreme Court of Appeals is therefore, of necessity, final, but the extent of it is a matter dependent wholly upon the legislative will. It may be made broad or narrow, as the discretion of the *605 Legislature shall dictate. It may be made to embrace the whole judicial appellate power, or a small portion of it only. It may be confined to civil controversies, or to actions at common law, or to suits in equity, or to actions or suits of a particular description. It may exclude civil controversies altogether, and be restricted to criminal causes. It may, from time to time, be extended or withheld, or withdrawn, as to the legislative mind may seem most expedient.
The policy which led to the constitutional requirement of a Supreme Court of Appeals, is sufficiently obvious, and needs no exposition. But it was a policy which could not be carried out by the fundamental law itself, without undertaking to regulate thereby the jurisdiction of the several Courts; and to have done this by a law so permanent in its nature, would have precluded such alterations in the distribution of the judicial power, as experience should suggest, and the changing wants and interests of the country at future periods require. Indeed, it would have been incompatible with the unlimited power given to the Legislature to establish Superior Courts, whether of civil or criminal, common law or equitable, original or appellate, jurisdiction, and to modify, change or abolish them at pleasure. It was therefore deemed best to ordain the establishment of a Supreme Court of Appeals, and to leave its practical usefulness unreservedly to the care and wisdom of the legislative department; nor could it be supposed that the representatives of the people would be indifferent to the advantages of such an institution, or fail to direct them to the promotion of the public interests.
The legislative control over the jurisdictions of the several Courts continues to exist, in relation to the litigation which they embrace, until the judicial power over it is exhausted ; when the matters of controversy cease to be the subjects of jurisdiction, and become the subjects of property. The judicial power is exhausted *606 in a cause when there has been a final and irreversible adjudication of it by a Court of competent jurisdiction, whether original or appellate. The claim or defence of successfui party then becomes a vested right, and removed beyond the pale, both of judicial cognizance and legislative regulation. Until then it remains within the province of jurisdiction, over which the legislative department has complete dominion.
There is no such thing as a lien upon the jurisdiction of a Court, obtained by the institution or prosecution therein, of an action or suit, whether original or appellate. So far as the Legislature may constitutionally distribute the judicial power amongst the several Courts of the Commonwealth, to the same extent they may afterwards re-apportion it, in the whole or in part, both prospectively and retrospectively; and no suitor has a right to complain that his cause is thereby transferred from the cognizance of one tribunal of justice to that of another. It cannot be doubted that the Legislature may establish an Appellate Court, intermediate between the Circuit Courts and the Supreme Court, with the final cognizance of any description of appellate causes from the Courts below, and by subsequent enactment transfer the same to the like cognizance of the General Court. The General Court itself is now such an intermediate tribunal in criminal cases, none of which, under the existing law, can ever reach the Supreme Court of Appeals. And why may not the Legislature, if the public interest requires it, disburthen the docket of this Court by transferring any portion of its business to the General Court; and if to the General Court, why not to any other Superior Court which they may choose to establish ?
The supremacy of this Court is to be found, not in the extent of its jurisdiction, or the amount of its business, but in the paramount force and authority of its adjudications — a force acting directly in controlling, *607 without being controlled by, other tribunals — an authority operating indirectly, from the respect and deference due to the highest tribunal known to the constitution and the laws. The influence of its authority extends beyond the range of its power. It is not limited by its actual, but is co-extensive with its potential jurisdiction — with its capacity to receive from the laws unlimited control over all cases decided by the subordinate tribunals. The conformity of the other Courts to its principles is not a slavish submission to the lash of power, but a willing and cheerful obedience yielded from a sense of propriety and duty.
The authority of the Supreme Court, as distinguished from its power, is not the less obligatory upon a subordinate tribunal, because the same has not yet been subjected, or only partially subjected to its jurisdiction. The principles of the civil and the criminal law are in many respects the same, and the same questions may arise in the administration of both. The General Court is still the Court of last resort in criminal cases; and yet can it be supposed that in the adjudication of a criminal cause, that tribunal would not be governed by a principle applicable to it, which had been settled by decisions of the Supreme Court of Appeals? Or does any one seriously believe that the latter would be bound to conform to the decisions of the former, because in the present state of the law the same are irreversible ? It would be difficult for those indulging such a fancy to stop short of allowing the like influence to irreversible decisions, not only of the Circuit Courts and the County Courts, but even of justices of the peace.
If the foregoing views be correct, in what respect does the law in question invade the constitutional supremacy of this Court? It provides for the trial, annually, by the Special Court of Appeals thereby constituted, of the seventy eldest causes ready for hearing, which shall have been depending more than two years in the branch *608 of the Supreme Court held at Richmond. The effect of this law is, by a uniform regulation, to withdraw from this Court a portion of its business, and send it to the determination of another forum. Its operation is, in the first place, to reduce the docket within a reasonable compass, and afterwards to keep it in the same condition. It affects the jurisdiction and not the supremacy of the Court. In truth, the difficulty of this question, it seems to me, has arisen from confounding the jurisdiction of the Court with its supremacy, which are far from being identical: the former is derived from the laws, the latter from the constitution; the former is temporary and mutable, the latter permanent and immutable; the former is the field for the exercise of judicial power, the latter is in itself the exercise of that power.
The moment it is ascertained that this Court continues supreme, it follows, from the same principles, that the tribunal organized by the law in question is neither supreme nor co-ordinate. It is true, that its adjudications are final and irreversible; but not more so than those of the General Court in criminal causes; not more so than many of those of the Circuit Courts, of the County Courts, and of justices of the peace. The right of appeal from that tribunal to this does not exist to-day, but the Legislature may allow it, to any extent, to-morrow. On the other hand, it is beyond legislative power to authorize appeals from this Supreme to that Special Court. There is no substance, therefore, in an objection removable by a mere shadow; the allowance, if it please the Legislature, of appeals from the Special Court, so restricted, in reference to amount, or otherwise, as to render the right illusory only. The Special Court is a subordinate tribunal, as much so as any other Superior Court which the legislative department may, in its discretion, from time to time establish; and is as much bound to defer to the authoritative decisions of the Supreme Court of Appeals.
*609 It is obvious that the necessity for legislation on this subject arose out of an excess of appellate jurisdiction, beyond the judicial force applicable to its administration. This involved a choice of expedients, of which there were but three at all feasible. One was to restrict the right of appeal from the Circuit Courts, to such a degree as to diminish greatly the amount of business flowing into this Court: another was to establish one or more intermediate Courts (or adopt the General Court in lieu of them) to receive and adjudicate the appeals from the Circuit Courts, with a right of appeal from the former to the Supreme Court, so restricted as to occasion the like result: the third was to suffer the appellate causes from the Circuit Courts to pass, as before, to the Supreme Court, and by establishing (or adopting) a Special Court, and transferring to it a portion of the business of the Supreme Court, curtail to a reasonable extent the docket of the latter. Of these expedients, the two former did not reach the immediate urgency of the prodigious mass already accumulated in this Court, and the first would have wholly abrogated the right of appeal in cases of considerable importance to many litigants: while the last, which the Legislature adopted, was free from these objections.
The Special Court is an auxiliary judicial force provided by the law in question for dispatch of the appellate litigation of the country, as would have been the General Court if adopted, or any intermediate Court if established, for that purpose. No one supposes that the constitution contemplates the transaction of all appellate business in the Supreme Court of Appeals; and as to so much of it as the Legislature may direct to be disposed of by auxiliary Courts, the mode of its reaching them is quite immaterial. What can be less substantial than the question, whether it should reach them by direct appeals, or by transfer from the docket of the Supreme Court? In truth, the General Court is now auxiliary to *610 the Supreme Court, by relieving it from all the appeals in criminal causes: would it be any thing more, if by legislative regulation the appeals in criminal cases should be tQ tjje gUpreme Court, and thence turned over in t}le w|10¡e or irj part to the General Court ?
The obvious reason why by uniform provision of the law in question, the Special Court receives its business from the docket of the Supreme Court, is that the primary object of the legislation was to remove the old deposit which stood in the way of the new accretions, and the latter it was both convenient and expedient to embrace in the same enactment. Now, so far as this law regulates future appeals, the objection to it, it will be seen, is merely formal; and so far as it regulates appeals already pending, the objection would seem to have sprung from a vague and fallacious idea that it is the existence, and not the exercise of jurisdiction, which places them beyond the reach of legislative regulation ; and that having been once brought within the precincts of this Court, whether by arbitrary appeal or otherwise, they have become, by a sort of constitutional enchantment, fixed and immovable. This idea, after what has been already said, would seem to require no further notice.
In the next place, we are to consider whether the law in question impairs the constitutional tenure of the judicial office. The act provides that the five Judges of the Circuit Superior Courts, who, for the time being, shall stand first in commission with respect to precedence and seniority, shall constitute the Special Court of Appeals: and the point of the objection is, that the seats of these Judges in that Court are judicial offices, to which they are not appointed, and which they do not hold, in the manner prescribed by the constitution. We have seen that the Judges of the Supreme Court of Appeals, and of the Superior Courts, are, by the constitution, to be elected by the joint vote of both houses of *611 the General Assembly; and the same instrument further provides, that they shall hold their offices during good behaviour, or until removal by a concurrent vote of the two houses, two thirds of the members present concurring in such vote, and the cause of removal being entered on the journals of each. And it has been urged that the Judges of the Special Court have not been appointed thereto in the manner so prescribed, and do not hold their offices until conviction, upon impeachment, of misbehaviour, or until removed by the joint vote of both branches of the Legislature as above mentioned; but that they have been appointed by statute, and are liable to be removed by the repeal of the same.
A judicial office imports the legal capacity and obligation of the incumbent to render judicial service, by holding one or more Courts of Justice: and it is true, that when the whole service is extinguished by competent authority, the office itself is thereby abolished. But the act in question creates no new judicial offices, and appoints no additional Judges; but merely attaches new duties to judicial offices already existing, to be performed by incumbents thereof already appointed; and this is clearly within the constitutional power of the Legislature.
We have seen that the constitution confides to legislative discretion the establishment, from time to time, of Superior Courts, and the regulation of the jurisdiction of the same, and of the Judges thereof :■ and it is easy to perceive that such Courts are thereby made subject to the complete dominion of the legislative department. They may be created, or abolished, or modified, or moulded into any form or condition, at the pleasure of the Legislature. A Court of Common Law may be converted into a Court of Equity, or a Court of civil, into a Court of criminal jurisdiction, and yet the new judicial duties be required of the same Judges. It cannot be doubted that the present Circuit Superior Courts *612 of Law and Chancery may be abolished, and District Courts established — some of common law, and others of equity jurisdiction, to be held by the present Judges, of w|lom some may be assigned to the former and the rest t0 ^ iatteri And it is equally clear that a new Court may be created and allotted as an additional service to the Judge of a Court already existing. This was done, even under the old constitution, by the act of 1788, establishing District Courts of Law, and directing them to be held by the Judges of the General Court.
But though the Legislature may thus retain the judicial service of the Judge of any Superior Court, notwithstanding the Court itself to which he was appointed be abolished; yet there being no obligation to do so, it follows that in the absence of any further constitutional provision on the subject, the extinguishment by legislation of the whole judicial service of the Judge, by abolition of the Court or Courts to which he had previously been appointed and allotted, without the substitution of any other, would have had the effect of depriving the Judge of his office; for though the Judge would not be removed from his office, the office would be removed from the Judge. In order to prevent such a result, in relation to any of the Judges, the wise expedient was resorted to of introducing the following clause into the 5th article of the constitution: “ No law abolishing any Court shall be construed to deprive any Judge thereof of his office, unless two thirds of the members of each house present concur in the passing thereof; but the Legislature may assign other judicial duties to the Judges of Courts abolished by any law enacted by less than two thirds of the members of each house present.”
The result of the various constitutional provisions bearing upon this subject is, that in relation to the Superior Courts, the judicial office of an incumbent is not an incident of his Court or Courts, but his Court or *613 Courts are incidents of his judicial office. He is appointed, it is true, by the joint vote of both houses to one or more Courts, but in effect he is potentially the Judge of a whole class of Courts, and the law might provide for his appointment in that form, with the assignment of special service. His judicial office consists of the legal capacity and obligation to render judicial service in any Court or Courts to which he may be called by authority of the Legislature, either by original appointment or subsequent legislation. His judicial service may be shifted or increased, or diminished, or even extinguished; but his judicial office continues, and he cannot be deprived of it by legislation, unless the law abolishing the Courts attached to it have the concurrence of two thirds of the members present in both houses.
The Legislature is thus unembarrassed by any constitutional impediments, in providing for and regulating the administration of justice, by means of the Superior Courts and the Judges thereof; and at the same time the qualified independence of the judiciary contemplated by the constitution, is preserved. In regard to new Courts and jurisdictions, the exigencies thereof may be supplied, in the discretion of the Legislature, from the judicial force already existing, or by the appointment of additional Judges. The law in question has wisely adopted the former alternative. And the case which has been cited of Kamper v. Hawkins, 1 Va. Cas. 20, only serves to shew that a difficulty which occurred under the old constitution can have no existence under the new. In that case, it was held that so much of the revised act of 1792, as gave chancery jurisdiction to the District Courts in injunction cases, was unconstitutional, inasmuch as the constitution provided that the two houses of Assembly should, by joint ballot, appoint Judges of the Supreme Court of Appeals and General Court, Judges in Chancery and Judges in Admiralty, to be commissioned by the governor.
*614 It remains to be considered, whether the law in ques- . , ... .. ...... tion violates the constitutional provision for judicial compensation. Our amended constitution provides, that „ jU(jgeg 0f Supreme Court of Appeals, and of the Superior Courts, shall receive fixed and adequate salaries, which shall not be diminished during their continuance in office.” The word salary, in its most usual and exact acceptation, imports a certain remuneration accruing at stated periods, for enduring personal service ; as so much for every week, or month, or year. But it is sometimes used in the sense of wages or emoluments, which may be precarious or fluctuating, or occasional, and affected-by price, value, or the time of actual labour. In order to avoid all ambiguity, and adopt, beyond cavil, the most usual and appropriate signification of the word, the adjunct “fixed” is also employed; and the two together, “ fixed salary,” convey a definite and precise meaning, as to which there can be no misapprehension. It is obvious, however, that these terms look to certainty and fixedness, and not to permanency, in the amount of compensation. They do not require that the amount should be unchangeably the same during the continuance of the incumbent in office ; and if they stood alone, there would be nothing to prevent the Legislature from altering prospectively, from time to time, the amount of the salary; and hence the necessity for the introduction of the additional words, “ which shall not be diminished during their continuance in office.”
In the insertion of these .additional words, the convention, doubtless, had in view a construction that had been given to the clause for judicial compensation in the old constitution, which simply ordains that “the Judges shall have fixed and adequate salaries.” By the act of January 1788, establishing District Courts, they were directed to be held by the Judges of the Court of Appeals. This act the Judges of the Court of Appeals declined to execute, and presented to the Legislature a *615 remonstrance against it as unconstitutional; and one of the grounds taken, was, that it greatly increased the la-hours of the Judges, without any corresponding reward; with the concession, however, that “ when public utility should require an increase or diminution of duty, there should be an analogous alteration of salary.” 1 Va. Cas. 103. This admission of the power of the Legislature to increase or diminish the salary, manifestly comports with the terms of the instrument; and whatever may be thought of the qualification, that it must be founded upon a corresponding addition or diminution of duty, there is evidently no room for it under the amended constitution, which absolutely prohibits a diminution of the salary, and which, by giving to the Legislature the unlimited regulation of the jurisdiction of the several Courts, and of the Judges thereof, precludes a Judge from higgling for an increase of compensation, as a condition of his executing a law requiring of him the performance of additional duties.
The judicial compensation, which is thus required by the constitution, is attached, not to the judicial service, but to the judicial office of the incumbent. It is in no wise dependent upon the judicial service ; for that the incumbent may be unable or unwilling to perform, or it may be diminished or wholly extinguished by legislation ; and yet his salary remains entire and indestructible during his continuance in office. The adequacy of the salary is of course a matter of mere legislative discretion, and can never be made the subject of legal adjudication ; and the considerations which should govern the amount are obviously of a general and permanent nature, and not such as are only temporary and occasional; for if determined in reference to the latter, it will not be adapted to different circumstances; and however much the service may consequently be diminished, there can be no reduction of the compensation. While therefore it was wise to ordain that a salary should be attached to *616 the judicial office, to which the incumbent might look as a certain and permanent support, it would have been unwise to inhibit all other compensation under all cir-stances, however just and reasonable it might seem to the legislative department. And accordingly we find in the constitution no such restraint upon legislative power.
The question, it will be observed, is not what power over this subject has been granted to the Legislature by the constitution, but what power in regard to it is inhibited to that department, by express terms or strong and clear implication. For undoubtedly the legislative authority is supreme in this and all other matters of government, except so far as restrained by the sovereignty of the people in convention. The Legislature has the charge of the public interests, faith and credit, and rules at its discretion, the policy, equity and bounty of the State.
The salary attached to the judicial office enures directly to the benefit and protection of the incumbent, and indirectly only for the advantage of the public. The constitution is mandatory in regard to its allowance, and prohibitory in regard to its reduction, but prescribes nothing as a safeguard to the public treasury against excess of remuneration, nor was any such security against improvident legislation at all requisite. There is no good reason why, besides the salary which the constitution requires to be attached to the judicial office, the Legislature may not in its discretion annex a compensation to a special judicial service, when from its temporary or occasional nature, or other circumstances, it would be impolitic to increase the permanent salary; or why, after such a service has been performed, there may not be considerations, such as its having been onerous and unexpected, appealing successfully to the justice and liberality of the law-making power.
There are repeated examples in our legislation, of compensation to a Judge for special service, over and *617 above his regular salary. By an act passed in the year 1826, in relation to the former Superior Courts of Law, there was a general provision, in the event of the failure of a Judge to hold any of the Courts of his circuit for two successive terms, for special terms thereof to be held by some other Judge of the General Court, for which he was to receive a per diem of eight dollars, besides mileage. Iu the year 1834, an act was passed, reciting that in consequence of the mass of business transferred from the late Chancery District Court of Richmond, to the Circuit Superior Court of Law and Chancery for the county of Henrico, to be adjudicated by that Court, and of other causes peculiar to the seventh judicial circuit, the compensation of the Judge of that circuit bore no proportion to the extent of his public labours and services; and therefore enacting that the Judge of that circuit should, in addition to his then salary, be allowed the sum of 200 dollars per annum for and during the term of three years. And in the year 1838, an act was passed, allowing the Judge of the twelfth judicial circuit, for duties thereby required, the sum of 600 dollars annually, for and during the term of five years, in addition to his salary. And so, if one or more of the Courts of any circuit should become so crowded with business as to render it impracticable for the Judge to dispatch the same within a reasonable time, why may not another Judge be required to aid him, by holding additional terms for that purpose, with the allowance of a special compensation for that special service ?
The law in question directs that “each of the said five Judges of the General Court shall receive ten dollars per day, for each day’s attendance on such Special Court,” besides mileage. We have seen that the purpose of the act was, by the aid of the Special Court, to effect a reduction of the docket of the Supreme Court, and then to keep it within a reasonable compass. It *618 was probably calculated by the Legislature, that the first °f these objects would be accomplished in a few years, and that thereafter the Special Court might be ¿jspense(j with, or that its duties would be but brief and 0CCasi0nal. And if so, was it not a wise and legitimate 3 t ° exercise of legislative discretion to compensate such additional service in the mode adopted, instead of making large permanent additions to the salaries of the Judges ? It seems to me clear that when a new special service is required of a Judge, it is within the province of legislation to determine, whether the compensation therefor shall be by an increase of the salary attached to the judicial office, or by a specific allowance during the continuance of the additional service.
If this were otherwise, still I do not perceive how the mode adopted for the compensation of the Judges can render the Special Court unconstitutional. It was competent for the Legislature to require the service, without any compensation therefor; and if that had been done, the objection must be taken as conceding that the acts of the Court would have been valid. Are they rendered null and void by a gratuitous allowance to the Judges of a per diem compensation, supposing that to be unconstitutional? Certainly not; the compensation would be void, but the service would be valid.
The supposed mischiefs and dangers of the construction given to the constitution by the enactment of the law in question are not unworthy of consideration ; but will be found, I think, upon even a cursory examination, to be merely theoretical.
The usefulness of the Supreme Court can be in no wise impaired by the operations of the Special Court. As a Court of administration it has no peculiar advantages, and justice may be quite as well dispensed in the other tribunals. Its chief value is a Court of jurisprudence, where the law may be expounded and settled, *619 upon thorough discussion, mature consideration and der . . . liberate conference: Hurried examinations and hasty opinions, extorted by the pressure and responsibility of a huge docket, must inevitably detract from the utility, weight and dignity of this forum. Unfortunately, with all the valuable assistance afforded by the Special Court, the labours of the Supreme Court, as a Court of administration, must still be too great to allow the full benefits which it ought to yield as a Court of jurisprudence. Will its usefulness in the latter respect be increased by depriving it of the aid which the legislative will has furnished in the former?
If no extrinsic judicial aid can be brought to bear upon the accumulated business of this Court, the result must be that though causes on this docket should not be reached for generations, they must still remain as monuments of the supremacy of this tribunal, until in the lapse of time decided here, or expelled and extirpated by a violent legislation. The principle even of Special Courts heretofore provided for, during a long period, by successive laws, to reach delays in particular cases, occasioned by interest or infirmity of some or all of the Judges, has been controverted; and such legislation placed on established precedent, or the plea of an extreme and overruling necessity. If any plea of necessity be admitted, I am aware of none more urgent than that of removing impediments to the administration of justice here, which have made the delays equivalent to denial, and have so seriously impaired the value of this tribunal, as to raise in the minds of some the question, whether it ought not, if allowable, to be abated as a nuisance. In truth, I do not hesitate to admit that, to rescue this forum from such a condition, and enable it to perform the purposes of its institution, was a necessity which might have warranted (in the absence even of the general grant to the Legislature of the regulation of the jurisdiction of the several Courts, *620 and of the Judges thereof,) a legislative commission to any incumbents of the judicial office, to dispose by adjudication of the arrears of business of this Court.
The alarm has been sounded of prospective legislative encroachments upon the judiciary, if the law in question should receive our sanction. It is urged that the next step may be to invest the Special Court with the power to grant appeals directly to that forum, and it is asked whether there will not then be two Supreme Courts of Appeals, instead of one. Whenever such a law shall be passed, it will be time enough to decide upon its constitutionality. The Legislature has wisely abstained from conferring such a jurisdiction, and has confined itself to a distribution of appellate business, with a view to the relief of this Court by means of an auxiliary tribunal. I deem a distribution or re-apportionment of appellate jurisdiction unobjectionable; and that it is wholly immaterial whether it takes effect as the beginning or the end of the appellate current. In the former case, it would doubtless be proper to have some uniform rule of distribution, as well as in the latter; which could easily be accomplished by prescribing what description of causes should go at once to the one forum, and what to the other. The Special Court, under such an arrangement, would be no more co-ordinate with the Supreme Court, than the General Court is at the present time, with its exclusive jurisdiction of a certain class of appellate causes, to wit, the appeals in criminal cases.
It is further urged, that though this law limits the transfer of causes to the Special Court to a certain number, and requires them to be of the longest pendency here, yet that the principle would equally warrant such transfer of any number, embracing too such as are most recent; that in this way the Supreme Court might be reduced to an empty pageant; and that another law, abolishing its existence, would render the Special Court, *621 in form as well as in effect, supreme. There can be no force in the argument, if the same result may be prodnced by a different course of legislation, acknowledged on all hands to be free from any constitutional impediment. Let us suppose a law directing all appeals from the Circuit Courts to be taken to the General Court, without giving any right of appeal from the latter to the Supreme Court. Would the jurisdiction so conferred on the General Court be unconstitutional, and its judgments null and void ? Or suppose such right of appeal from the General Court to be granted in controversies of the value of a million of dollars, would that remove the objection ? Is it not perceived that under such a law, the Supreme Court would be left, in the lapse of time, without jurisdiction; and yet that the mischief would be without remedy, except at the hands of the Legislature ?
Whether the Legislature has the constitutional power to abolish the Supreme Court of Appeals, with or without the establishment at the same time of another, is a question which does not arise in this cause, and is one too grave for the expression of an incidental opinion. I will merely observe, that upon the supposition of the legislative power to abolish this tribunal, it would be very remarkable if there were none to remedy mischiefs in regard to its jurisdiction, while in existence.
Another sound of alarm is, that if the principle of a per diem allowance for judicial service be conceded, it may lead to the legislative abuse of fixing the regular salary at an inadequate sum, in order, by means of an additional per diem allowance, which may be rescinded at pleasure, to render Judges subservient to the passions and prejudices of the Legislature. But the argument proves too much : for the supposition of a fraudulent purpose renders all safeguards unavailing. It is as easy to imagine the design to be to fill the judicial offices with corrupt tools, with the expectation of their being influenced by the hope of an increase of salary.
*622 The truth is there are various constitutional duties, affee-ting the judiciary, confided to the Legislature, which must rest for their performance upon the good faith, ju¿gment an¿ discretion of that department, and which canno,: enforced by any other authority, except that of the people in choosing their representatives. Thus it is the duty of the Legislature to provide a Supreme Court of Appeals, and such Superior Courts as the due administration of justice may require: but if they should disregard that constitutional obligation, where is the remedy ? So they are bound to invest the Supreme Court with an extent of jurisdiction sufficient for the accomplishment of the purposes of its institution: but who ean exact the performance of that trust ? And so it is incumbent upon them to provide for the Judges adequate salaries: but should they fail to do so, where is redress to be sought for such a mischief? Indeed, the constitutional securities for the judiciary are wholly ineffectual, without a previous performance of legislative duties; and consist mainly in the guarantees of vested rights. Thus when jurisdiction has been conferred upon the Supreme Court of Appeals, and it has proceeded to pronounce a judgment or decree, no legislation can authorize an appeal from the decision. So when the judicial offices have been filled by the appointment of Judges, the incumbents cannot be removed therefrom by any act of legislation. And so when a salary has been attached to the judicial office, the diminution of it, to the prejudice of the incumbent, is beyond the competency of legislative power. But there is nothing in the constitution to countenance the idea, that because cases have once fallen within the jurisdiction of this Court, they can never be removed from it by any regulation of law, however urgently required for the administration of justice, and the promotion of the public weal.
Upon the whole, it seems to me the law in question is wise and salutary, and in the true spirit of the consti *623 tution, which does not aim at a beau ideal of judicial restraint upon legislative power, to be attained by the sacrifice of practical good sense in the administration of the government — that we are not at liberty to indulge in theories as to the general plan and scope of the instrument, and make them the touchstone of its actual provisions — that we must look to the plain terms and true import of its grants and limitations of power, and decide questions arising upon them as we would any other points of law presented for legal adjudication— that we are not tribunes of the people, clothed with authority to put our veto upon laws, the tendencies of which we may suppose to be adverse to the public weal or safety — that there is no express negation in the constitution of the legislative powers exercised by the law in question, and no necessary implication of such negation by the declarations which it contains of legislative duties — that, on the contrary, the recognition by various clauses of the authority to establish and abolish Courts, and to regulate their jurisdiction, imports a wide field of legislative discretion — that no judicial legislation is allowable, with a view to the erection of barriers against apprehended legislative abuses under the forms of the constitution — that the correction of such corruptions, when they come, is by an appeal to the people at the polls — and that when it shall be found no redress can be had there, it will be idle to seek it from any other tribunal.
The cause has been ably and earnestly discussed on both sides, and I have given it all the consideration which circumstances have allowed: and, with a perfect conviction that no good objection has been shewn by the return to the rule, or otherwise, I think the writ of mandamus ought to be awarded.
Allen, J. The objections to the validity of the act of March 31, 1848, for re-organizing the General Court, *624 and constituting a Special Court of Appeals, may be considered under two general divisions: The first, relating to the character of the Court thereby created; the p0Werg jmpai'ted to it; and the rights of suitors in-in controversies now depending in the Supreme Court of Appeals. The second, referring to the Judges of the Superior Courts, upon whom new duties are imposed, and the mode by which compensation for additional services is to be made. In presenting the reasons which have conducted me to a conclusion, I shall not attempt to comment on many of the arguments which have been presented. The act upon its face shews that the Legislature was actuated bjr no other motive than a proper desire to provide a remedy for the delays of justice, growing out of the accumulation of the business in the Court of Appeals. That there was no intention to interfere with the constitutional rights of the Supreme Court, or to impair the independence of the judiciary ; and if such be the effect of the law, it has resulted from mistake and not design. In the scheme of the judicial system, presented by the constitution, we have a Supreme Court of Appeals, the County Courts, and between them, such Superior Courts as the Legislature may, from time to time, ordain and establish. The County Courts, as then existing Courts, were perpetuated, and the Supreme Court, when called into being, also exists as a constitutional Court. The continued existence of such Superior Courts, as might from time to time be established, was made dependent on the discretion of the Legislature, to modify, change or abolish, as public convenience required. We can have but one Supreme Court of Appeals; it is incompetent for the Legislature to constitute a co-ordinate tribunal, for if supreme, it can share no divided empire. If the effect of the act under consideration, is to constitute such a co-ordinate Court, invested with a portion of the supremacy of the Court of last resort, it will be in conflict with the constitution, and therefore invalid.
*625 In ordaining that there should be a Supreme Court of Appeals, the constitution did not'designate what portion of judicial power it should exercise. All judicial power was vested in it and the County Courts, and such Superior Courts as might be established, and the Judges thereof. But no attempt was made to define their jurisdiction. In this respect, departing from the provisions of the old constitution, by which Judges were to be appointed to exercise certain portions of the judicial power; and also differing from the constitution of the United States, which declares that a certain portion of the judicial power vested in the federal judiciary, shall belong to the Supreme Court, as part of its original jurisdiction, but that the residue of the judicial power vested in it, shall be exercised by it as a Court of appellate jurisdiction only. If the constitution had been silent as to the mode of exercising the judicial power conferred, though a law might have called the Court into existence, and Judges have been duly appointed, the Court would have possessed no inherent power to act in any case. Legislation would have been still necessary to give it jurisdiction over the case submitted, and prescribe the manner in which it should be exercised. It would, in that case, have rested in the discretion of the Legislature, to carry out the mandates of the constitution. The constitution rests upon the presumption, that the same community which has ordained it, will appoint proper agents to carry its provisions into effect; that the Legislature will not only organize the Court, but carry out the spirit of the constitution by conferring upon it all appropriate jurisdiction, so as to fulfil the objects of its creation. The construction of the constitution is not to be entered upon in a spirit of distrust towards the legislative department. For if that be felt and acted upon, our system of government would become impracticable. There is no external force which can be brought to bear so as to compel the Legislature to discharge any *626 of its functions. By abstaining to elect a governor, we may be left without an executive; by refusing to pass laws, or repealing those in existence regulating the jurjg(jjC|.jon Qourts and Judges, the judicial power wovrtd m abeyance. Such extreme suppositions lead to no practical result. But to remove all doubt as to the discretion intended to be confided to the Legislature, it is expressly declared “ that the jurisdiction of these tribunals, and the Judges thereof, shall be regulated by law.” In the language of Judge Marshall, as recorded in the Debates of the Convention, page 505: “ The article leaves the whole subject open to the Legislature. They may limit or abridge the jurisdiction of all the Courts as they please.” And again : “ The whole subject of jurisdiction is submitted, absolutely and without qualification, to the power of the Legislature.” In the exercise of this discretion, they have portioned out the jurisdiction amongst the different Courts ; and in doing so, have withheld from the jurisdiction of the Supreme Court of Appeals, all cognizance of criminal cases; and in civil cases, have restricted it (with certain exceptions) to controversies where the matter involved amounted in value to 100 dollars, or upwards. They could, in their discretion, have limited it to any other sum.
There being no limitation on the discretion of the Legislature, in the regulation of the jurisdiction of the Court, the supremacy which characterizes and distinguishes it from other tribunals, cannot be affected by legislation bearing merely on the jurisdiction confided to it. It is not the less supreme, because no appeal lies to it from the judgments of the General Court in criminal cases. It would still remain the Supreme Court, though jurisdiction in cases of wills, or any other branch of jurisprudence, should be denied to it.
Nor does its supremacy result from the exercise of appellate jurisdiction: Every Court in the Commonwealth *627 is an Appellate Court in certain cases. Nor is it a consequence of the finality of its decisions in cases of appeals; for the judgments of every other Court are final within certain limits, whether the cases be brought before them by appeal or original process. Nor does its supremacy depend on the importance of the controversies submitted to its cognizance : The General Court by the existing law decides finally in cases involving the life of the citizen. The principle upon which the supremacy of the Court rests is not to be found in any of these circumstances. We have Courts endowed with all these attributes, and yet they are confessedly subordinate tribunals. It is the consequence of the fact that the form of the Court cannot be changed or modified at the will of the Legislature; it must exist as a Supreme Court or not at all; and because its judgments are not only final by the law giving it jurisdiction, but there exists no power to subject them to revision : otherwise it would cease to be the highest, and if so, the Court of the last resort. The Court can act in no case except by virtue of and in the mode prescribed by law; and the Legislature may at their discretion, enlarge or limit its jurisdiction. But when it has acted upon a case confided to its jurisdiction, the judgment is binding on all. Though existing laws may make the judgments of other Courts final within certain limits, or over a particular class of cases, or in all cases decided by them, the Legislature can, by a different regulation, subject all the decisions to be pronounced by such Courts to review in some higher tribunal, or the Supreme Court. But it is incompetent on the- part of the Legislature to subject a decision, which may be rendered by this Court, to revision elsewhere. No tribunal exists, or under the constitution, can be called into existence, which can reverse its judgments. Being thus irreversible, its judgments stand, from the necessity of things, as authoritative expositions of the law, whenever the same question arises *628 in other cases. For it is to be presumed that the Court, from principles of public policy, and for the repose and security of private rights, will adhere to its matured 0pjn¡011; and apply the same rule to all cases of like character. Where the decision of an inferior Court is pronounced in a case from which no appeal is allowed, it furnishes the law of the case; but is not authority which binds the same or other tribunals, because there is no assurance that the principle announced as law will be sustained in the Court of the last resort.
If such is the true exposition of the grounds upon which the supremacy of the Supreme Court of Appeals rests, in what respect does the Special Court resemble it, or share in the supremacy imparted to it by the constitution ? The number of Judges composing it, the attendance of the same clerk, &c., are mere outward forms which do not affect the power of the Court. Nor, as I think has been shewn, does its exercise of appellate jurisdiction, or the finality of its decisions under the existing law, constitute it a Supreme Court.
The cases submitted to it are withdrawn, it is true, from the docket of this Court. But they were placed there in consequence of a law regulating the jurisdiction of the Court; and the power which, in the exercise of an unlimited discretion, first enacted the law giving the jurisdiction, and is competent to repeal it, may rightfully so modify it, as to effectuate the object had in view in first conferring jurisdiction ; the fair and speedy termination of controversies and enforcement of rights. The judgments of the Special Court give the law of the case, as long as the Legislature allows no appeal; but they possess no intrinsic authority as expositions of the law, binding on other Courts ; because it is competent for the Legislature to allow an appeal from its decisions ; and this furnishes a full security for that uniformity of decision which is one of the great objects to be attained by the establishment of a Supreme Court. The Judges *629 of the Special Court are as much bound to yield to the authority of the Supreme Court of Appeals, as are the Judges and Justices of the inferior Courts, where the question arises in cases in which their decisions are final. The Court falls within the class of Superior Courts, which the Legislature may, from time to time, ordain and establish, and assign to it such jurisdiction as the Legislature may think proper; and make its decisions final, or subject them to revision, as the Legislature may deem expedient. It cannot then be a co-ordinate tribunal. It is not a branch of the Supreme Court, even if it were competent to divide it, a question not arising under this law, for the Judges are not commissioned as Judges of the Supreme Court of Appeals ; much less can it be an appendage to any other tribunal. Should it be said, that if a power be conceded to the Legislature so to legislate as to submit to the jurisdiction of another tribunal the same description of cases as are also confided to the jurisdiction of this Court, this Court may eventually be shorn of its power, and converted into an idle pageant — the answer is, that the same result might follow, could any such design be imputed to the Legislature, by the exercise of what I believe all concede to be their unquestioned power. They have excluded it from all criminal jurisdiction ; they may withdraw from its jurisdiction cognizance over any other branch of jurisprudence ; they may limit the right to appeal to any amount, as they have done already, to a certain amount; and I find no restriction in the constitution upon their discretion as to this matter. The constitution does not declare that the right of appeal to the Court of last resort, should be allowed in every case. And as it could not, for obvious reasons, give the right in every case, it made no provision for any case. It declared that the Court of last resort should be established, leaving it to the Legislature to determine, from time to time, what jurisdiction *630 it should exercise; in the confidence that it would be organized, and its jurisdiction so regulated, as to enable it to fulfil its appropriate functions, and exert, when necessary and deemed expedient, a controlling authority over inferior tribunals. It seems to me that there is nothing in the character of the Special Court which conflicts with the supremacy of this Court. That instead of being co-ordinate, it is as much a subordinate tribunal as the General Court, and therefore that this objection to the validity of the law is not well founded.
If the act does not constitute a co-ordinate tribunal with the Supreme Court of Appeals, and is free from objection on that account, the enquiry presents itself, whether it impairs any existing rights of suitors in the Appellate Court? When the jurisdiction once conferred has attached, has the suitor a vested right to the judgment of the Appellate Court, of which legislation cannot deprive him? If this were so, the same argument would apply to every other Court; and it would be incompetent for the Legislature to discontinue any Court, and transfer the pending business to some other tribunal. Such a position would be against the whole current of our legislation, as well under the former as the present constitution. The business of the old General Court was transferred to the District Courts; of the latter, to the Superior Courts of Law which succeeded them ; and so with the former High Court of Chancery, when the District Chancery Courts were established: and cases under the existing law are transferred daily from the County to the Circuit Courts. To hold that such legislation, general in its character, not operating on particular individuals, or a selected class of cases, but bearing equally on all, was liable to any constitutional objection, would have the effect of perpetuating and entailing on the Commonwealth, every tribunal once ordained, no matter how inconvenient and burthensome it might be found in practice. The right to an appeal or *631 a writ of error, is a remedy provided for a supposed injustice. It may be entirely withheld, as it is in many instances; and when allowed, can be exercised only under such limitations and regulations as the law prescribes. Legislation respecting it relates to the remedy merely. Justice requires, that when once allowed, it should not be arbitrarily taken away. That when it becomes expedient to abolish a Court, or to divide the business before it amongst other Courts, or to relieve an existing Court from a mass of business which it cannot transact within a reasonable time, some other tribunal should be substituted to dispose of the cases then pending and undetermined. The character of that tribunal must be left to the discretion of the Legislature, under the general and unlimited authority to regulate the jurisdiction of the Courts and the Judges thereof; subject to the single limitation, that the persons authorized to determine the cases, are judicial functionaries, appointed and compensated in the mode pointed out in the constitution, and holding office by the tenure there prescribed. This has been done by the act under consideration, if it was competent to impose such duties on the Judges designated, a matter to be considered hereafter. Out of abundant caution, and to relieve the law from all imputation of harshness, the proviso to the fourth section declares, that no case shall be placed on the docket of the Special Court, where any party, by himself or his counsel, shall object thereto. This proviso was not necessary, for the reasons before assigned, to the validity of the act. But if the reasons are unsound, it would remove all objection. It is argued that infants and others labouring under disabilities, are interested in causes, and they could not consent; but their disability is a provision of municipal law, and there is no constitutional prohibition against removing it. The same remark applies to the argument that consent cannot give jurisdiction; it is a provision of law which the Legislature may *632 change, by declaring that consent shall give jurisdiction, provided proper judicial functionaries are appointed to exercise it. It was found necessary at a recent period to provide a remedy for the accumulation of business in the judicial circuit embracing the City of Richmond, and additional Courts were created and Judges appointed. Could not the Legislature have authorized and required any of the Judges of the General Court to hold Special Courts to hear and determine such of the pending causes as the parties might consent to bring before them ? And furthermore to have declared that the judgments of such Special Court should be entered in the order book of the clerk of the regular Court, to have the same validity and be enforced in the same mode with the judgments of the regular Court ?
In truth the jurisdiction is given in such cases, not by the consent of the parties, but by law authorizing and requiring judicial functionaries to exercise their jurisdiction over cases brought before them in the mode prescribed. Whether that mode be by original process, appeal, or consent of parties, cannot affect the validity of their judgments. I do not think that the law establishing the Special Court impairs any vested rights of suitors.
If there be nothing in the character of the Court in conflict with the constitution, and the rights of suitors be not impaired, it becomes necessary to enquire whether the constitution is violated by imposing these duties on the Judges selected to perform them ? The constitution declares that the judicial power shall be vested in a Supreme Court of Appeals, in such Superior Courts as the Legislature may from time to time ordain and establish, and in the Judges thereof, in the County Courts, and in justices of the peace, with power to vest proper jurisdiction in Corporation Courts, and the magistrates who belong to the corporate body; and also declares that the jurisdiction of these tribunals, and the Judges thereof, shall be regulated by law.
*633 The words are general. The whole judicial power is vested in the tribunals and functionaries designated. It does not prescribe the mode by which this power was to be exerted. It makes no discrimination between different kinds or degrees of judicial power, or the forms in which it is to be exercised. The jurisdiction is to be regulated by law; and whether it shall be taken as a Court of original jurisdiction, or by way of appeal, the power exercised is judicial power, with which by the constitution the tribunals and functionaries described are invested. The Judges to compose the Special Court are Judges of the General and Circuit Courts — the Superior Courts which the Legislature is empowered from time to time to ordain and establish. When proceeding to execute the power, it was necessary to designate the Courts established by some distinctive appellation. They were called the General Court and Circuit Superior Courts of Law and Chancery, and the Judges were so commissioned. But the power vested in the Judges,- and the jurisdiction which was conferred, did not depend upon the name. The power under the constitution was to be judicial; the mode of exerting it was prescribed by law in regulating the jurisdiction. Clothed by the constitution with all judicial power, vested by law with the jurisdiction to exercise it, the obligation upon the Judges to perform the duties, is complete. Their commissions, it may be said, are silent on the subject of appellate jurisdiction; but it may be asked, are they more explicit as to original jurisdiction ? They are commissioned Judges of certain Courts — the Superior Courts contemplated by the constitution — and the law establishing the Courts conferred upon them both original and appellate jurisdiction. Their commissions, therefore, must embrace both the original and appellate jurisdiction conferred on those Courts. But the commissions do more. They are the Judges of the Superior Courts the Legislature were from *634 time to time to ordain and establish. When elected and commissioned, they are vested with judicial power generally; and the jurisdiction not only of the tribunals ^ were appointed, but of the Judges presiding over them, may be regulated by law. They may be rightfully required to exercise their judicial power in any mode the law may direct, the Legislature possessing the power to declare that their judgments, in cases confided to their jurisdiction, shall be final, or liable to be reviewed, and if erroneous, reversed, by the Supreme Court of Appeals.
The old constitution declared that “the two houses of Assembly shall, by joint ballot, appoint Judges of the Supreme Court of Appeals, and General Court, Judges in Chaucery and Judges of Admiralty.” Instead, however, of proceeding to appoint Judges of the Supreme Court of Appeals by joint ballot, the act of May 1779, for constituting a Court of Appeals, formed the Court of the Judges of the High Court of Chancery, General Court and Court of Admiralty. The Judges of these Courts, without any new commissions, proceeded to organize the Court of Appeals, and the Court so constituted continued to act as the Supreme Court of Appeals, until the act of December 1788 directed that the Court should consist of five Judges, to be chosen by joint ballot and commissioned by the governor. Amongst the Judges who composed part of the first Court, we find the names of Pendleton and Wythe, Lyons, Carrington and others, men who, besides their eminence as jurists, participated in the formation of the constitution under which they were acting. In the remonstrance of the Judges against the act establishing District Courts, 4 Call 144, allusion is made to the formation of the Court of Appeals. 11 The Court of Appeals, of whomsoever constituted, must necessarily act upon the subjects referred to all the others, and therefore the forming it, so as to consist of all the Judges, is no violation ■of the constitution.”
*635 This was a cotemporaneous exposition of the old constitution, and proves that the Courts at that day did not deem it essential that there should be a previous election or commission to authorize a Judge appointed and commissioned to another tribunal, to exercise appel1 L late jurisdiction in a different Court created by law. When the act of December 1788 substituted a new to the old Court of Appeals, the Legislature treated the old Court as a legislative Court, which it was competent to abrogate by law. The Judges thought otherwise, but to remove all difficulties resigned their appointments as Judges of the Court of Appeals. See proceedings, 4 Call 149. But whether a legislative or constitutional Court, does not affect the present argument. It was an Appellate Court, held by virtue of commissions in distinct tribunals, and the validity of its decisions has never been questioned. Yet under the old constitution there would have been more reason for insisting on a distinct appointment and commission than at this time. The constitution then provided for the appointment of distinct Judges to exercise different portions of judicial power. The Judges in that remonstrance say “ that no regulation should blend the duties of the Judges of the General Court, Court of Chancery and Admiralty Courts, which the constitution seems to require to be exercised by distinct persons.” And when the attempt at a subsequent period was made to blend them, it was held, in Kamper v. Hawkins, to be a violation of the constitution. It was in view of the embarrassments growing out of this restriction upon the Legislature, and to guard against them thereafter, that the comprehensive terms were adopted which are found in the new constitution. The Judges are to be appointed to exercise judicial power generally, whether at common law or in chancery, as Courts of original or appellate jurisdiction, as the law may direct; and, as I couceive, is as applicable to this tribunal and the Judges *636 thereof, as to the Judges of the Superior Courts. The 2d section of the act of 1819, 1 Rev. Code 190, authorized the Court to act as a Court of original jurisdictjon_ The act passed during the present session, with a v¡ew- (0 determination of the question now under consideration, does the same thing. The writ of mandamus, except when resorted to as an accessory to appellate jurisdiction, is an emanation from original jurisdiction only. It was accordingly held, in Marbury v. Madison, 1 Cranch 137, that as the constitution had declared in what cases the Supreme Court shall have original jurisdiction, it negatived the exercise of it in all other cases; and therefore the 13th section of the act of 1789, vesting in the Supreme Court power to issue writs of mandamus generally to any Courts appointed, or persons holding office under the authority of the United States, was declared to be void, because it was a grant of original jurisdiction not warranted by the constitution.
The constitution of Kentucky restricts the jurisdiction of the Court of Appeals to appellate jurisdiction only. In Daniel v. Warren County Court, 1 Bibb 496, it was held, that the mandamus being an incident to original jurisdiction, the Court of Appeals had no power to award it. Conceding that this Court could award a writ of mandamus to an inferior tribunal, as an incident to its appellate jurisdiction, to enable it properly to exercise its jurisdiction and enforce its judgments, this is not that case. We are asked to award the writ, to enforce the judgment of a distinct tribunal. Upon the return, issues of fact as well as of law may be raised, and they are to be determined according to the course and principles of the common law. The jurisdiction, therefore, which we are called upon to exercise, is, I think, original, not appellate. There is no direct prohibition to the exercise of such jurisdiction as in Kentucky; none to be implied from an enumeration of the *637 cases in which the Court may exercise original jurisdiction, as under the constitution of the United States. On the contrary, each Court and Judge, by our constitution, is vested with authority to exercise any judicial power, when the jurisdiction is conferred by law. In this respect a wider latitude of discretion is allowed to the Legislature than would seem to have been contemplated by the constitution of the United States. That declares “ that the judicial power of the United States shall be vested in one Supreme Court, and in such inferior Courts as Congress may, from time to time, ordain and establishand after enumerating the cases to which the judicial power shall extend, gives to the Supreme Court original jurisdiction in certain enumerated cases, and declares that in all other cases it shall have appellate jurisdiction. But for this enumeration of the cases in which original jurisdiction was given, there would have been no objection to the law authorizing it to award writs of mandamus to persons holding office under the authority of the United States. The first clause of the fifth article of our constitution vests “ the judicial power in a Supreme Court of Appeals, such Superior Courts as the Legislature may, from time to time, ordain and establish, and the Judges thereof.” There is no clause restricting the Court to the exercise of appellate jurisdiction, such as is found in the constitution of the United States. The judicial power is vested not only in the Courts, but in the Judges thereof, a provision not contained in the constitution of the United States. Yet, the Judges of the Supreme Court of the United States also act separately, as Judges of the Circuit Courts; and exercise in these Courts original jurisdiction in cases where the Supreme Court cannot exercise original jurisdiction ; and they do this under their appointment and commissions as Judges of the Supreme Court alone. If I supposed this Court could not be invested with original jurisdiction, this whole discussion would be out of *638 place, as jurisdiction precedes discretion ; and we should be chargeable with the grave error imputed to another tribunal, of pronouncing an opinion upon the merits of a controversy which we had no jurisdiction to decide. ^ seems t0 me) therefore, it was competent to impose the duties required to be performed by the act under consideration, upon any of the regularly appointed Judges of the Superior Courts; and the constitution is not thereby violated.
The constitution declares that the Judges shall receive fixed and adequate salaries, which shall not be diminished during their continuance in office. The act of March 31, 1848, re-organizes the General Court, and constitutes a Special Court of Appeals; and directs that each of the'Judges composing those Courts shall, in addition to his annual salary, receive 10 dollars per day for each day’s attendance on such Special Court, and the General Court. This mode of compensating the Judges is objected to, inasmuch as it is not fixed, but variable, depending on the number of days the Judge may attend, and also because it is not permanent, but may be diminished or entirely taken away by lessening the terms of the Court, or repealing the law. It may be premised, that even if there was an irregularity in the mode of compensation provided, it could not affect the validity of the judgments rendered by the Court, if I am correct in the conclusion that the law is free from all constitutional objections in other respects. They would still be the judgments of properly appointed functionaries, vested by that appointment with competent judicial power, and pronounced in cases rightfully submitted to their jurisdiction. The law does not treat this compensation for their services as a portion of the salary. It gives it in addition to the salary. In the sense of the constitution, the salary is a stated periodical payment for services. Fixed does not mean unchangeable; otherwise the increase, as well as diminution, would be unconstitutional; i *639 and the provision against diminishing would have been supererogatory. The constitution of the United States directs that the Judges shall, at stated times, receive for their services a compensation which shall not be diminished during their continuance in office. The old constitution declared that the Judges shall have fixed and adequate salaries. In the remonstrance of the Judges before referred to, the subject of compensation being then under consideration, they say that the salary should be considered as fixed, whilst the duties continued the same; and when public utility required an increase or diminution of duty, there should be an analogous alteration of salary: thus indicating that the term fixed, did not restrict the power of the Legislature to increase or diminish the salary ; but was used in the same sense with the phrase “ stated times,” in the constitution of the United States, both expressions conveying the same idea. The compensation could not be made to depend on fees or other contingent emoluments. The amount is to be ascertained, to be paid periodically, and to be adequate. It may be increased, and but for the other clause, that it should not be diminished during the continuance in office, could have been reduced, notwithstanding the use of the word fixed.
This compensation, so ascertained, and to be periodically paid, with any addition made to it to be similarly paid, constitutes the salary secured by the constitution. Of this the Judges were in the receipt when required to perform these extra duties, and could not be deprived of it during their continuance in office. Nor does this law interfere with it, but gives the per diem, not as constituting a portion of the fixed salary attached to their office, but as extra compensation for temporary services, to continue so long as these duties are required of them. There is no constitutional restriction on the Legislature from allowing to the Judge extra compensation for such additional duties. If it may be allowed, it would be *640 most unreasonable, so to construe the constitution as to make the allowance perpetual, against the terms of the grant, and when the duties had ceased which had formed ^ consideration of it. The Judge looks to his stated saklT as furnkhing his certain support, and his independence in the sense of the constitution, is sufficiently secured, by denying to the Legislature all power over it. The independence of the judiciary would be more endangered by the construction which would withhold from the Legislature power to make additional and temporary compensation, for extra and temporary duties. Owing to various contingencies, such as accumulation of business at particular localities, growing out of some revulsion in commercial affairs, the illness of a Judge, or some other cause, a temporary grievance exists, to which some remedy must be applied.
There may be a sufficient number of Judges to perform the duty and transact the ordinary business of the country. As additional labour, though temporary in its duration, is required, additional expenses, not foreseen or contemplated when the office was accepted, are to be incurred, justice requires a proper compensation should be made. To deny the right to make it, would constrain the Legislature to be the involuntary instruments of injustice to the officer; or compel it to create additional officers, holding by a life tenure, though the duties required of them might have been performed in a brief period of time. The community would speedily relieve itself of such burthensome sinecures, by subjecting the office itself to the control of the Legislature. The mode of compensation adopted in this law, has received the sanction of usage from the earliest period of the Commonwealth. The Judges of the Special Courts of Appeal were allowed a per diem, and it has been received without question, by every Judge attending on such Courts, from the passage of the law to the present day. Mileage has been allowed to the Judges for the distance *641 travelled; it varies with that distance, and constitutes no part of the salary. If it be said these allowances are made for extra expenses, they are still expenses incurred in the performance of their judicial functions; and the per diem allowed by the law under consideration, is also intended to meet, in part, extra expenses incurred by a residence for a considerable time at a distance from their regular homes. And unless the Judge is to be deprived of the comforts of his family, the allowance would, perhaps, in some instances, be not much more than adequate to meet the additional charge. The provision made for holding Courts in Judge White’s circuit during his protracted illness; the allowance of 200 dollars to Judge Clopton for three years, by the act of 1834; the more recent allowance to Judge Thompson for five years, furnish examples of such legislation to remedy a temporary grievance. I think the mode of compensation adopted in such cases, contravenes no provision of the constitution ; that it was sanctioned by usage before the adoption of the present constitution, and has been followed since; and that so far from impairing the independence of the judiciary, its tendency is to preserve it; inasmuch as it enables the Legislature to provide for temporary grievances without an unnecessary addition to the number of the Judges.
I have thus briefly stated the reasons upon which my opinion is based, and have preferred to discuss the questions presented, upon principle, rather than to rely upon precedent.
The laws in relation to the Special Courts of Appeal, in existence when the present constitution was adopted, furnish a precedent directly in point, and fully sustain the validity of the act now under consideration. Believing it free from all constitutional objection, I think the Judge of the Circuit Court was bound to enter up the decree for aught that appears on his return to the *642 rule; and therefore the rule should be made absolute, and 1 . . , , a mandamus ms% awarded.
Brooke, J. The question whether a law is in ac-cor(jance with the constitution, is at all times a very delicate and important question. In the case of Goddin v. Crump, 8 Leigh 120, I differed with the rest of the Court. I thought that the act of Assembly, authorizing the people of Richmond, or a majority of them, without regard to property, to give authority to the common council of the corporation to impose a tax on the city to the amount of 600,000 dollars, for the great State improvement of the James river, violated the constitution: and I refer to my opinion in that case for the grounds on which I so thought. The President, who delivered the opinion of the Court, thought it a local improvement; and that the act was constitutional. If it was a local improvement, the act was unnecessary, as the charter of the corporation gave to the common council full authority to levy taxes for local objects.
The question now before us is a different one. I have said it was a delicate question. This results from the different functions of the various departments of the government. The Legislature is elected by the people; come immediately from the people; and they take an oath to support the constitution. They are clothed with the power to make the laws ; and many of the members are able lawyers. It should not, therefore, be in a doubtful case, that the acts of that body should be decided by the Courts to be unconstitutional. But this Court has on several occasions decided laws to be unconstitutional ; and it cannot now be questioned that it has the power to make such a decision.
The question before us is, whether the law constituting the five oldest Judges of the Circuit Courts a Special Court to decide the cases taken from the docket of this Court, without objection by any of the parties there *643 to, is constitutional. The necessity for this law arises from the cases being so numerous that great delay of the justice of the country has occurred. .This delay is similar to that which occurred when there were not a sufficient number of Judges, from some cause, who could sit in a particular case, and for the decision of which, a Special Court, constituted of the Judges of this Court who could sit in the case, and Judges of the General Court, was provided by the former law. And I think it is impossible to distinguish these Special Courts from this Special Court, which, it is argued, violates the constitution.
The first objection made to this act is, that it violates that article of the constitution which declares that there shall be one Supreme Court of Appeals. This act, it is said, creates another Supreme Court of Appeals. But this Special Court has no appellate powers. It cannot grant an appeal, writ of error or supersedeas, in any case, and can only decide the cases sent to it from this Court, from whence process of appeal must issue.
The next objection is, that the Judges have not been elected Judges of the Special Court. The constitution gives to the Legislature the regulation of the jurisdiction of the Courts and Judges; and it was authorized to give to the Court of Appeals jurisdiction, and take it away and give it to the Special Court. This had been the practice under both the old and new constitution, as in the case of the Special Courts before spoken of. Under the old constitution I was commissioned as a Judge of the General Court, and sat as a Judge of the District Court, without being elected a Judge of the District Court. When these Courts were abolished, and the Circuit Courts were established, I was transferred to these Courts, without a new election.
The next objection to this law is, that the compensation of 10 dollars per day impairs the independence of the judiciary, as it makes them dependent on the *644 Legislature. This objection equally applied to the former Special Courts, as the Judges who sat in these Courts received 5 dollars per day for less service than that imposed upon the present Special Court.
There was an attempt in the argument to shew that the former Special Courts were unconstitutional; but the Court of Appeals, which has power to decide on the constitutionality of the laws, has too often decided that point to have it now questioned.
Mr. Jefferson, who was jealous of the power of the judiciary to nullify a law, by deciding it to be not in accordance with the constitution, thought that in flagrant violations of the constitution, the judiciary might exercise that power. I thought the case of Goddin v. Crump, 8 Leigh 120, was a flagrant case, but a large majority of the Court thought differently. I think the case now before us is a plain case, and that the act in question is entirely consistent with the constitution in every particular; and I concur with the majority of the Court in so deciding it to be.
Cabell, P. stated his opinion to be, that the law establishing the Special Court of Appeals is free from all constitutional objection, and consequently, that a writ of mandamus tiisi should be awarded.
Mandamus nisi awarded.